1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

FRANCISCO FIERRO OBESO,

             Plaintiff,

    v.

CAROLYN W. COLVIN,

Acting Commissioner of Social Security,

             Defendant.

_____

Case No. 1:15-cv-00151-SKO

**ORDER ON PLAINTIFF'S SOCIAL SECURITY APPEAL**

## I.    INTRODUCTION

Plaintiff, Francisco Fierro Obeso ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act.  42 U.S.C. § 1381-83. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II.    FACTUAL BACKGROUND

Plaintiff was born on June 30, 1952, and alleges disability beginning on June 14, 2009. (Administrative Record ("AR") 25-36; 305-06; 310; 351.)  Plaintiff claims he is disabled due to pain in his upper and lower back.  (*See* AR 256.)  Plaintiff cannot speak, read, or understand English.  (AR 80; 354-55.)

---

[1]   The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7; 10.)

**A.     Relevant Medical Evidence**

On June 26, 2009, x-rays of Plaintiff's lumbar spine revealed asymmetric loss of disk height at L3-L4 and L4-L5, likely contributing to mild scoliosis, marginal osseous hypertrophic spurring consistent with osteoarthritis, and loss of disc height at L5-S1 and L4-L5, suggesting chronic disc degeneration.  (AR 414.)  On July 10, 2009, county health clinic physician Arnold Welden, M.D., prescribed Naprosyn and Vicodin to alleviate Plaintiff's back pain and noted Plaintiff's pain was "aggravated by bending, turning, and lifting."  (AR 415.)

On November 7, 2009, orthopedic surgeon Semon Bader, M.D., examined Plaintiff at the request of the state agency.  (AR 423-28.)  Dr. Bader observed Tinel's signs in Plaintiff's bilateral wrists and decreased sensation in the bilateral median nerve distribution, and limited Plaintiff to non-strenuous, non-repetitive manipulative activities to accommodate his bilateral carpal tunnel syndrome.  (AR 425-27.)  Dr. Bader diagnosed Plaintiff with discogenic low back pain, and limited Plaintiff to lifting and carrying no more than 50 pounds frequently and 25 pounds occasionally, walking and standing no more than six hours in an eight-hour workday, and performing no more than occasional postural movements, i.e., climbing, balancing, kneeling, crawling, bending, crouching and stooping.  (AR 425.)

On December 23, 2009, State agency physician I. Ocrant, M.D., reviewed Plaintiff's medical records and adopted Dr. Bader's assessment in part, specifically rejecting Dr. Bader's opined manipulative limitations.  (AR 430-34.)  Dr. Ocrant further opined that the occasional postural limitations assessed by Dr. Bader would limit Plaintiff to performing light work. (AR 422.)

On August 7, 2009, Dr. Welden prescribed Elavil as a sleep aide.  (AR 448.)  On August 17, 2009, Dr. Welden examined Plaintiff and noted diffuse paralumbar muscle tenderness with palpation 2-3 inches from midline.  (AR 446.)  Dr. Welden opined that Plaintiff had chronic back pain, especially in his left paralumbar area.  (AR 446.)  Dr. Welden continued to observe mild paralumbar muscle tenderness in September, October, and December 2009 and January and February 2010.  (*See* AR 436, 438, 440, 442, 444.)  In January 2010, Dr. Welden observed that the tenderness in Plaintiff's paralumbar muscle had expanded to 3 inches from midline and in

February 2010, Dr. Welden noted the tenderness had expanded to 4 inches from midline. (AR 436, 438.)

State agency physician C.E. Lopez, M.D., reviewed Plaintiff's medical records and affirmed Dr. Ocrant's assessment on June 21, 2010.  (AR 450-51.)

On August 31, 2010, Plaintiff reported to Dr. Welden that his back pain had gradually improved and he thought he could go back to work.  (AR 494.)  Dr. Welden opined Plaintiff's lower back pain had resolved and he could go back to work as of August 14, 2010.  (AR 494.)  On December 28, 2010, Plaintiff reported left shoulder pain of about 20-days duration.  (AR 491.) Rocio Medina, M.D., observed tenderness to palpation in the lateral aspect of the left shoulder right below the acromion; a slightly positive drop test; and normal range of movement in the left arm and left shoulder, but noted that Plaintiff grimaced with pain with movement.  (AR 491.)  Dr. Medina diagnosed Plaintiff with left subacromial bursitis and, because Plaintiff had no insurance, prescribed a less expensive anti-inflammatory medication.  (AR 491.)  In January 2011, Dr. Medina administered a corticosteroid injection to address Plaintiff's ongoing left shoulder pain and restarted Plaintiff on the more expensive Norvasc because it had been more effective. (AR 488.)

On September 6, 2011, Dr. Welden opined Plaintiff was unable to perform full-time work at any exertional level.  (AR 453.)  Dr. Welden, however, assessed Plaintiff as being able to sit for four hours in an eight-hour day; stand/walk for four hours in an eight-hour day; lift 15 pounds frequently and 20 pounds occasionally; and reach, handle, feel, push/pull, and grasp for one hour before having to rest his hands.  (AR 454.)  On October 12, 2011, Plaintiff self-rated pain in his paralumbar muscle as a 4/10 with medication.  (AR 484.)

On December 12, 2011, Plaintiff reported he had recently worked for 6 days but had been unable to fulfill all required job duties, including jumping on and off big trucks, due to worsening back and leg pain.  (AR 482.)  Dr. Welden diagnosed Plaintiff with back pain with acute exacerbation, put Plaintiff on disability, and resumed his pain medications.  (AR 482.)  On December 23, 2011, Dr. Welden observed "very limited" range of motion in Plaintiff's back and noted Plaintiff could not bend "very much," and extended Plaintiff's disability.  (AR 480.)

In January 26, 2012, Plaintiff told Dr. Welden he was going to go see his doctor in Sinaloa, Mexico.  (AR 478.)  On February 28, 2012, Plaintiff reported his pain as a 0/10.  (AR 477.)  On March 7, 2012, however, Dr. Welden noted Plaintiff was unable to lift or bend down due to excruciating pain.  (AR 475.)  On June 5, 2012, Dr. Welden's noted tenderness in Plaintiff's lumbar spine and moderate pain with motion on examination.  (AR 471.)

On July 11, 2012, Plaintiff saw Jose Luis Carraso, M.D., an orthopedist in Mexico. (AR 458-61.)  The report of an imaging study ordered by Dr. Carraso, as well as his treatment notes, are in Spanish and have not been translated.  (*See* AR 458-61.)

From August to November 2012, Dr. Welden continued to treat Plaintiff and renew his prescriptions.  (AR 462-69.)  On March 22, 2013, Dr. Welden opined Plaintiff could only perform sedentary work.  (AR 510.)  In an eight-hour workday, Dr. Welden opined Plaintiff could only sit for one hour at a time for a total of three hours and stand/walk for one hour at a time for a total of three hours.  (AR 510.)  Dr. Welden further opined Plaintiff must lie down or elevate his legs twice in an eight-hour workday and had been disabled to this degree for one year.  (AR 510.)

**B.    Testimony**

   **1.    Plaintiff's Work History and Self-Assessment**

In an adult disability report completed with the help of his daughter on July 21, 2009, Plaintiff reported that he is unable to speak or understand English and has been disabled by upper and lower back pain since June 14, 2009.  (AR 354-55.)  Plaintiff reported past work experience as an agricultural field laborer from 1988 through June of 2009.  (AR 356.)   The job included "picking, trimming, prunning (*sic*), irrigation, tr[uc]k driver, tractor driver, dairy cleaning, feeding cows, [and] maintena[n]ce in ranch" and required him to walk and stand for eight hours and sit for three hours, stoop, kneel, and crouch for three hours, and handle large objects and reach for eight hours in each eight-hour day.  (AR 356.)   He frequently lifted approximately 25 pounds. (AR 357.)

On July 29, 2009, Plaintiff completed a pain questionnaire and reported constant, severe low back, posterior knee, and right shoulder pain accompanied by loss of strength since March of 2004.  (AR 363-65.)  Plaintiff reported that narcotic pain medication does not alleviate his pain

4

symptoms.  (AR 363.)  He must stop any activity after 10-15 minutes due to pain, and can only stand or sit 10 minutes at a time.  (AR 365.)

In his disability appeal form on March 8, 2010, Plaintiff reported he spends most of his day lying down and has trouble dressing himself, showering, driving for long periods of time, staying still for long periods of time, and doing housework.  (AR 381.)  Plaintiff completed a pain questionnaire on April 21, 2010, that repeated his report in the July 2009 questionnaire.  (AR 384-86.)  On July 21, 2010, Plaintiff completed a disability appeal form and reported that his pain was "getting greater and greater" and that he must change positions often because the pain "spreading through all [his] body" is so great.  (AR 390.)  Plaintiff told the agency interviewer that

> . . . I am still in severe pain and it spreads from my back to my neck and also to my legs causing them to get weak with the medications it forces me to lay down in bed because I cannot stay still in the sam[e] position for longer than 10 minutes it would be impossible for me to find a job where they would allow me to rest every 10 minutes or even take a nap caused by all the medications I am taking. Every day I depend more and more on other people to help me with my daily tasks, my self[-]esteem is going down because of this pain and having to depend on others.

(AR 393.)

## 2. Hearing Testimony

### a. Plaintiff's Testimony

The April 24, 2013, hearing was done by video with Plaintiff represented by counsel and accompanied by an interpreter[2] and Vocational Expert ("VE") in Fresno, CA, and with ALJ DiMaggio Wallis presiding in St. Louis, MO.  (AR 45.)  Plaintiff testified he came to the United States in 1988 from Mexico and never attended school.  (AR 49.)  He is unable to read or write in English "at all" but can read or write "a little bit" in Spanish.  (AR 49.)

Plaintiff last worked for about 45 days during the summer of 2012 as a tractor driver and for about four months total in the fall of 2011 as a truck driver.  (AR 49-50.)  Plaintiff stopped working due to his pain and difficulty using his leg to push the pedals on the truck he drove for work.  (AR 54-55.)  Plaintiff was forced to take repeated rest periods for his leg and is unable to last a full workday using his leg to push pedals.  (AR 55.)  Plaintiff repeatedly moved around in

---

[2]   At both of his hearings, Plaintiff testified with the assistance of an interpreter.  (AR 45; 72.)

his seat at the hearing to get relief from his discomfort and estimated that after about 15 minutes he would have to get up due to pain.  (AR 55-56.)  Plaintiff testified he has a problem with his left shoulder that causes him to lose strength, and when asked to point to the part of his shoulder that bothers him, he pointed to his right shoulder and explained that his right shoulder bothers him the most.  (AR 57.)  He has problems using his bilateral hands but has not spoken with a doctor about it.  (AR 57.)

Plaintiff stated that he is unable to work full-time because he is in "a lot of pain" and his right leg does not support him.  (AR 51.)  He has used a cane to ambulate in public for the past two years, though no physician prescribed the use of a cane.  (AR 51.)  Pain medication and rest are the only things that alleviate his pain.  (AR 52.)  Plaintiff is able to lift eight or ten pounds at a time, stand and sit about 15 minutes at one time, and lies down five times each day for about an hour at a time.  (AR 52.)  He cannot bend over but can squat down, and can go up stairs or steps very slowly.  (AR 52.)  He is unable to shower, bath, or get dressed by himself because he needs help washing the lower part of his legs.  (AR 53.)  He does not cook, but is able to use the microwave or make a sandwich on occasion.  (AR 53.)  He does not do any chores and goes shopping with his wife, but is able to feed his pets, water his plants, talk on the phone, and watch television.  (AR 53.)

### b.    Plaintiff's Attorney's Statement

At the hearing, Plaintiff's attorney contended that: Plaintiff is limited to sedentary or, alternatively, light activity due to his low back impairment and would "grid out" under the Grids framework[3] for either type of work (AR 51); the only job that would accommodate a limitation to "no more than" six hours of standing or walking and "that it kind[ ] of suggests the [G]rids at medium where you have especially illiteracy involved in the mix" (AR 66-67); and Plaintiff could perform no more than light work, cannot do any past relevant work, and would therefore "grid out" at light work (AR 67).

---

[3]    The Medical-Vocational Guidelines, or "Grids," are applied at the fifth step of the analysis under 20 C.F.R. § 404.1520, and present, in table form, a short-hand method for determining the availability and numbers of suitable jobs for a claimant.  *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114-15 (9th Cir. 2006); *see* 20 C.F.R. § 404, subpt. P, app. 2.

### c.  Vocation Expert Testimony

The VE testified that Plaintiff has past relevant work as a farm machinery operator, Dictionary of Occupational Titles ("DOT") 409.683-010, heavy work with an SVP[4] of 3, and as a fruit farm worker I, DOT 403.683-010, medium work with an SVP of 5.  (AR 60.)  The ALJ asked the VE to consider a hypothetical individual of the same age, educational background, and work history as Plaintiff, with the following functional limitations:

> . . . can lift and carry, and can push and pull up to 50 pounds occasionally and up to 25 pounds frequently.   This person can stand or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  This person can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds.

> . . . [and] can stand or walk for six hours in an eight-hour workday, but has no limit sitting.  He can occasionally balance, stoop, kneel, crouch, and crawl.

(AR 60.)   The VE testified that such an individual could not perform any of Plaintiff's past relevant work, but could perform other work including representative occupations of hand packer, DOT 920.587-018, medium work with an SVP of 2, electronics worker, DOT 726.687-010, light work with an SVP of 2, and laundry worker, DOT 361.587-010, light work with an SVP of 2. (AR 60.)   The VE testified that the occasional postural limitations would "rule out the great majority of medium jobs."  (AR 61.)

The ALJ then asked the VE to consider a hypothetical individual who

> . . . can lift and carry and push and pull up to 50 pounds occasionally and up to 25 pounds frequently; can stand or walk for six hours in an eight-hour workday, and [has] no limits in the ability to sit.  This person can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; can frequently balance, stoop, kneel, crouch, and crawl.  Can frequently reach overhead with the left upper extremity; can frequently push, pull, and operate foot controls with both lower extremities.

(AR 60.)  The VE testified that such an individual could perform Plaintiff's past relevant work as a farm worker, as well as other work including work as a hand packer, DOT 920.587-018, industrial cleaner, DOT 381.687-018, and cleaner II, DOT 919.687-1014, both medium work with an SVP of 2.  (AR 62.)

//

---

[4]   Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

The ALJ then modified the hypothetical to add that the person would have to change positions every hour and would be off task for one minute each time he did so, would need to use a cane in one hand when walking, and could only occasionally stoop, kneel, and crouch. (AR 62.) The VE testified that such a person could not work. (AR 62.) The ALJ also asked whether a person off task an hour each day would be able to work, and the VE testified that such a person would not be employable. (AR 63.)

The ALJ then asked whether Plaintiff had any skills readily transferable to a full range of sedentary work. (AR 63.) The VE testified that Plaintiff had only "agricultural-based skills" and there would be no sedentary- or light-type positions "within that realm of employment." (AR 63.)

Plaintiff's attorney asked the VE to consider the same individual as in the first hypothetical, with the additional restriction that the individual would be able to walk and stand "no more than" six hours out of an eight-hour workday. (AR 64-65.) The VE testified that the positions identified "all require standing throughout the workday" and therefore would all be eliminated. (AR 65.) Plaintiff's attorney then asked the VE whether he had seen the hand packer job in person, and whether the job would require more than occasional postural activities. (AR 65-66.) The VE testified that there would not be any erosion of the number of jobs available based on more than occasional postural activities. (AR 66.) Plaintiff's attorney then asked whether there would be any overhead lifting or reaching in the hand packer job, and the VE testified that while there would "be very limited" overhead reaching, there would be "continuous" forward reaching. (AR 66.)

**C.    Administrative Proceedings**

On July 21, 2011, ALJ Michael Haubner issued a written decision and determined Plaintiff was not disabled for the period from June 14, 2009, through the date of the decision. (AR 116-32.) Plaintiff appealed ALJ Haubner's decision to the Appeals Council under the new and material evidence provision, 20 C.F.R. § 404.970 (AR 209-22), and the Appeals Council vacated ALJ Haubner's decision and remanded the case for reconsideration on December 6, 2012 (AR 134-35 ).

On June 19, 2013, ALJ Sandra DiMaggio Wallis issued a written decision and found that Plaintiff had a severe impairment of "disorders of the back." (AR 28.) The ALJ determined that

this impairment did not meet or equal a listed impairment.  (AR 28.)  The ALJ found Plaintiff retained the residual functional capacity ("RFC")

> . . . to lift/carry and push/pull up to fifty pounds occasionally and up to twenty-five pounds frequently, can stand/walk for six hours in an eight-hour workday, and has no limits on his ability to sit during the workday.  Further, [Plaintiff] can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; and can occasionally balance, stoop, kneel, crouch, and crawl.

(AR 28-29.)

Given this RFC, the ALJ found that Plaintiff was unable to perform his past relevant work.  (AR 35.)  The ALJ considered Plaintiff's age and determined that he was 56 years old, defined as an "individual of advanced age," on the alleged disability onset date and that he had turned 60 years old on June 30, 2012, and therefore become a person "closely approaching retirement age" prior to the rendering of the decision.  (AR 35.)  The ALJ then determined that Plaintiff was not able to communicate in English and would be considered "in the same way" as an individual who is illiterate in English.  (AR 35.)  After considering Plaintiff's age, education, work experience, and RFC, the ALJ determined there were jobs existing in significant numbers in the national economy Plaintiff could perform, including representative occupations such as hand packer, DOT 920.687-018, assembler, DOT 806.684-010, farm worker, DOT 401.687-010, seed cutter, DOT 404.686-010, and worm farm laborer, DOT 413.687-014, all unskilled medium work.  (AR 36.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (AR 36.)

The Appeals Council denied Plaintiff's request for review on November 21, 2014, making the ALJ's decision the Commissioner's final determination for purposes of judicial review.  (AR 1-9.)

**D.     Plaintiff's Complaint**

On January 25, 2015, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff contends that the ALJ erred in assessing Plaintiff's residual functional capacity to work and erred at step 5 of the sequential evaluation.  (Doc. 14.)

//

//

### III.   SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

### IV.   APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

//

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In Step 1, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, the ALJ moves to Step 3 and determines whether the claimant has a severe impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled.  *Id.* §§ 404.1520(d), 416.920(d).  If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

Plaintiff contends the ALJ erred at step five of the sequential evaluation and based his residual functional capacity assessment on insubstantial evidence.  (Docs. 14; 19.)

**A.     The ALJ's Consideration of the Medical Evidence**

Plaintiff contends the ALJ erred in rejecting the opinions of treating physician Dr. Welden in full and examining physician Dr. Bader in part.  (Docs. 14; 19.)

**1.     The ALJ's Consideration of Dr. Welden's Medical Opinion**

Plaintiff contends the ALJ failed to articulate legally adequate reasons for rejecting treating physician Dr. Welden's opinion that Plaintiff was unable to perform full-time work.  (Doc. 14, pp. 12-15.)  The Commissioner contends the ALJ properly discounted Dr. Welden's opinion as inconsistent, poorly explained, and contradictory to the weight of the evidence.  (Doc. 18, p. 13.)

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not

treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id*. Where a treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id*. at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Factors relevant to evaluating medical opinions include the amount of relevant evidence that supports the opinion and the quality of the explanation provided and the consistency of the medical opinion with the record as a whole. *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

The ALJ considered Dr. Welden's opinions as to Plaintiff's ability to work and determined "they lacked credibility for a number of reasons." (AR 33.)

> . . . Starting with the broader issues first, [Plaintiff]'s treatment record documented the presence of some back impairment and [Plaintiff] did allege some ongoing back pain. However, Dr. Welden's own treatment notes did not document that [Plaintiff] had the types of limitations that Dr. Welden identified in his medical opinions. [H]e did intermittently note that he felt that [Plaintiff] had some work restrictions, but even these statements were inconsistent. In one instance, he stated in March of 2012 that [Plaintiff] could not lift o[r] bend down due to excruciating pain. Yet, during the same office visit where he said [Plaintiff] had excruciating pain, he diagnosed [Plaintiff] with mild pain. The month prior, he had also noted that [Plaintiff]'s pain was "0" on a 10-point scale. This type of inconsistency is present throughout Dr. Welden's treatment records, wherein he repeatedly noted that [Plaintiff] had mild pack pain, at most mild findings on evaluation, consistently recommended only conservative treatment, and never documented any specific exertional or other limitations. Overall, Dr. Welden's own treatment notes did not support almost any of his statements about [Plaintiff]'s functioning and strongly suggested that his opinion statements were not credible.

(AR 34.) Plaintiff contends that any "inconsistencies" between Dr. Welden's opinions and his treatment records "were caused by the fact that whenever Plaintiff tried to work, his pain worsened." (Doc. 14, p. 13 (stating that any inconsistencies in Dr. Welden's opinion arose from

the "waxing and waning of Plaintiff's pain").)   However, this conclusion is not clear from the medical record; rather, the record reflects complaints of shoulder and back pain treated almost exclusively by Ibuprofen (AR 29-30; 415-20; 457-509) and reports of disabling pain accompanying observations of mild pain, mild tenderness, and mild decrease in range of motion (*see* AR 415-99 (repeatedly noting mild diffuse tenderness to palpation, occasionally noting decreased range of motion in unspecified areas of the body, and twice noting "decreased range of motion" and "full range of motion" with pain throughout the movement of Plaintiff's left shoulder)).   These relatively minimal observations are inconsistent with Dr. Welden's ultimate conclusion in March 2013 that Plaintiff is incapable of full-time work beyond sedentary work.

The ALJ also noted that Dr. Welden's 2011 and 2013 opinions were neither internally consistent, nor consistent with one another.  (AR 34 (*comparing* AR 453 *with* 510).)  A review of Dr. Welden's 2011 assessment reveals an obvious contradiction between Dr. Welden's ultimate opinion that Plaintiff is incapable of working and his opinion imposing exertional limitations suggesting Plaintiff is capable of performing the requirements of at least sedentary to light work. Dr. Wedlen also inconsistently opined that Plaintiff has no limitations due to hand impairments (AR 453 (opining the section to be "n/a" to Plaintiff)) yet would be moderately to severely limited in his ability to reach, handle, feel, push/pull, and grasp (AR 454) and conclusorily opined without explanation or reference to any diagnostic findings or clinical observations that Plaintiff met the requirements of Listings 1.02 and 1.04 based upon Plaintiff's complaints of "back pain" (AR 453-54).  Dr. Welden's 2013 assessment also "agree[d] with [Plaintiff]'s feeling of only [being] able to do sedentary work" based on "examination[s]" but providing no objective findings or observations on which he based his assessment, indicating that his conclusion was based instead upon Plaintiff's subjective complaints.  (AR 510.)

Under the regulations, clinical findings include the results of physical or mental status examinations, and diagnostic findings are statements of the disease or injury based on its "signs and symptoms."   *See* 20 C.F.R. §§ 404.1513(b), 416.913(b).  While a medical report should include clinical findings and diagnoses, there is no requirement that clinical and diagnostic "evidence" must be submitted with a residual functional capacity assessment, *see id.*, particularly

1   if the record already contains such evidence.  *Giles v. Astrue*, No. EDCV 08-1088-JC, 2009 WL

2   2984049, at *7 (C.D. Cal. Sept. 17, 2009.)  Here, Dr. Welden did not refer to *any* clinical findings

3   or diagnostic evidence in support of his opinions of extreme limitations on Plaintiff's ability to

4   work; there is nothing in the two-page 2011 or single-page 2013 assessment indicating that Dr.

5   Welden independently reached any formal diagnoses or based his opinion on any clinical,

6   objective findings.  (*See* AR 453 (offering a diagnosis of "back pain" based on objective findings

7   of "back pain"); 510 (offering a diagnosis of "low back pain" based on objective findings of

8   "examination").)

9        Further, Dr. Welden's treatment records from June 2009 through November 2012

10   documented several instances of improvement to the point where Plaintiff could return to work

11   (*see* AR 494 (August 2010); mild complaints of pain (*see* AR 491 (December 2010,

12   recommending ibuprofen and range of motion exercises to address complaint of shoulder pain);

13   489 (January 2011, recommending medication management and performing left shoulder

14   injection); 463-69 (August to November 2012, prescribing ibuprofen repeatedly and Tramadol

15   once to address pain complaints)), or no complaints of pain at all (*see* AR 476 (February 2012,

16   self-reporting pain of 0/10).)

17        Contrary to Plaintiff's contentions, Dr. Welden's treatment records did not establish that

18   Plaintiff's condition was progressively worsening to become disabling or that Plaintiff would be

19   precluded from performing any type of modified medium work because of his impairments.  In

20   fact, the ALJ specifically explained that he was discounting Dr. Welden's 2011 and 2013

21   assessments because they "were not consistent with each other" and that "[w]hile this might be

22   expected if [Plaintiff]'s impairments became worse over time, the limited objective treatment

23   record did not suggest that [Plaintiff's] impairments became significantly more limiting in 2012

24   and 2013 relative to what they were in 2010 and 2011." (AR 34.)  The ALJ permissibly found that

25   Dr. Welden's treatment notes failed to support the extreme limitations to which he had opined.

26   *See Tommasetti*, 533 F.3d at 1041 ("incongruity" between physician's treating record and

27   responses to a questionnaire was proper basis on which to discount credibility where the

28   physician's "ultimate conclusions" regarding the extent of plaintiff's limitations "did not mesh

1   with her objective data or history").

2        The ALJ also noted that Dr. Welden's 2013 assessment appeared to state that Dr. Welden

3   had relied "at least somewhat on [Plaintiff]'s subjective assessment of limitations[.]"  (AR 34; *see*

4   AR 510 ("As his personal nursing physical (*sic*) I I (*sic*) agree with [Plaintiff]'s feeling on only

5   [being] able to do sedentary work").)   While a physician can, with firsthand impressions and

6   clinical evidence, give credence to a claimant's subjective claims, *Ryan*, 528 F.3d at 1199-1200,

7   Dr. Welden's opinions are bereft of these necessary firsthand impressions and clinical evidence.

8   To the extent Dr. Welden's opinion *was* based upon Plaintiff's subjective complaints, the ALJ

9   permissibly rejected Dr. Welden's opinion because Plaintiff's testimony had already been properly

10  discounted as incredible.   *Tommasetti*, 533 F.3d at 1041 (citing *Morgan v. Comm'r Soc. Sec.*

11  *Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)).   To the extent Dr. Welden's opinion *was not* based

12  upon Plaintiff's subjective complaints, because the ALJ properly discredited Dr. Welden's opinion

13  on other permissible bases, any error in discrediting Dr. Welden's opinion on that basis is

14  harmless.   *See Carmickle v. Comm'r of Soc. Sec. Admin.*, 553 F.3d 1155, 1162 (9th Cir. 2008) (an

15  error is harmless where there "remains substantial evidence supporting the ALJ's conclusions on

16  . . . credibility and the error does not negate the validity of the ALJ's ultimate [credibility]

17  conclusion") (internal citation and quotations omitted) (alteration in original).

18       Plaintiff does not dispute that his own credibility was properly discounted by the ALJ or

19  that this was a legitimate reason for discounting Dr. Welden's opinion.  (*See* Docs. 14, pp. 12-15;

20  19, pp. 5-6.)  Plaintiff instead contends that "an opinion offered by a treating physician in a form

21  with little explanation must be considered in the context of the treatment record and the

22  physician's experience with [the] claimant" and asks the Court to look beyond the "four corners of

23  the forms completed by Dr. Welden" to determine whether Dr. Welden's opinion was indeed

24  supported by the record.  (Doc. 19, pp. 5-6.)

25       Dr. Welden's questionnaire assessments, however, are not supported by firsthand

26  impressions and clinical evidence in his treating notes or in the overall medical record.  A review

27  of Dr. Welden's treating notes and questionnaire responses reveal only diagnoses and opined

28  limitations imposed by those diagnoses – save a single slightly positive "drop can test" on the left

side in December 2010 observed by another physician at the county clinic (AR 491), there are no specific diagnostic findings offered in support of Dr. Welden's conclusory opinion in the 2011 questionnaire that Plaintiff is unable to work (*see* AR 435 (basing his opinion on the "objective finding" of "back pain")) or his conclusory opinion in the 2013 questionnaire that Plaintiff is limited to only sedentary work (*see* AR 453 (basing his opinion on "examinations")).  (*See* AR 415-20; 435-49; 452-56; 510.)  What clinical observations there are in the record were non-severe: Plaintiff repeatedly demonstrated mild diffuse tenderness to palpation (*see* AR 415; 417; 419; 436; 438; 440; 442; 443; 444; 446; 447; 448; 463; 465; 466; 469; 471; 478; 480; 482;484; 486; 496; 499), "decreased range of motion" (*see* AR 419 (decreased range of motion); 463 ( "moderately reduced" range of motion; 465 ( "mild pain" with motion); 466 (same); 469 (same); 473 (same); 475 (same); 471 ( "moderate pain" with motion); 480 ("very limited" range of motion"), and "full range of motion" with pain throughout the movement of his left shoulder (*see* AR 488-89; 491-493).  (*See also* AR 414 (2009 imaging study revealing only mild degenerative changes).)  These relatively minimal observations do not support Dr. Welden's conclusory opinion that Plaintiff is incapable of full-time work beyond sedentary work.

The ALJ finally noted that

> . . . there were no other medical opinions that came close to agreeing with [Dr. Welden's] assessment.  Instead, one of the State agency doctors and Dr. Bader agreed that [Plaintiff] retained the ability to perform exertionally medium work. While Dr. Bader's assessment somewhat agrees with Dr. Welden's 2011 assessment that [Plaintiff] might have some limitations related to carpal tunnel syndrome, he did not broadly opine that [Plaintiff] had extensive reaching, handling, fingering, and grasping problems.

(AR 34.)  Plaintiff contends that "mere disagreement by a non-treating medical source is not a specific, legitimate reason for rejecting a treating physician's opinion" and asserts that the ALJ erroneously relied on Dr. Bader's assessment to undermine Dr. Welden's credibility after assigning only partial weight to Dr. Bader's assessment.  (Doc. 14, pp. 13-14.)

As an initial matter, though the ALJ discounted Dr. Bader's opinion regarding Plaintiff's manipulative limitations as unsupported by the record, it is undisputed that the ALJ fully credited Dr. Bader's opinion that Plaintiff could perform medium work with some postural limitations.

1   (AR 32-33.)   Further, every examining or reviewing medical source found Plaintiff capable of

2   performing a range of light to medium work.  (*See* AR 34; 422 (Dr. Ocrant's assessment of light

3   work to accommodate postural limitations); 423-28 (Dr. Bader's assessment of medium work with

4   postural limitations); 450-51 (Dr. Lopez affirmed Dr. Ocrant's assessment).)  This is not an issue

5   of "mere disagreement by a non-treating source" as Plaintiff contends.  No other medical source

6   opined that Plaintiff could not work or was incapable of performing the requirements of even light

7   work.  (*See generally* AR.)

8        The ALJ properly relied on the lack of support in the medical opinion evidence as one of

9   several factors in discounting Dr. Welden's opinion.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149

10  (9th Cir. 2001) (holding that while "the contrary opinion of a non-examining medical expert does

11  not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's

12  opinion, it may constitute substantial evidence when it is consistent with other independent

13  evidence in the record") (citing *Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir. 1989); *Matney*

14  *v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("[w]hen confronted with conflicting medical

15  opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and

16  unsupported by clinical findings").

17        Plaintiff finally contends that the ALJ should have recontacted Dr. Welden for clarification

18  rather than rejecting his opinion.  (Doc. 14, p. 15 (relying on Social Security Ruling ("SSR")

19  96-5p[5] (requiring the adjudicator to make every reasonable effort to recontact a treating source for

20  clarification if the basis for his opinion cannot be ascertained)).)  However, Plaintiff misstates the

21  ALJ's burden to flesh out the record: "The claimant bears the burden of proving that she is

22  disabled."  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).  The ALJ's duty to recontact a

23  medical source or order a review of that source's records is only triggered where the medical

24  record is insufficient to make a disability finding or the evidence conflicts to the extent that the

25  ALJ cannot reach a conclusion.  20 C.F.R. §§ 404.1512(e), 416.912(e) ("[w]hen the evidence we

26  _____

27  [5]   Social Security Rulings ("SSR") are final opinions and statements of policy by the Commissioner of Social Security, binding on all components of the Social Security Administration. 20 C.F.R. § 422.406(b)(1).  They are "to be relied upon as precedent in determining cases where the facts are basically the same."  *Paulson v. Bowen*, 836 F.2d

28  1249, 1252 n.2 (9th Cir.1988).

1  receive from your treating physician or psychologist or other medical source is inadequate for us

2  to determine whether you are disabled, we will need additional information to reach a

3  determination or a decision."); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  The ALJ

4  determined that Dr. Welden's assessments were inconsistent, poorly explained, and contradictory

5  to the weight of the evidence, *not* that Dr. Welden's opinions were ambiguous or somehow

6  rendered the record insufficient to reach a disability determination.  (AR 33-34.)  The ALJ was

7  under no duty to solicit a further and unnecessary supplement to Dr. Welden's properly rejected

8  opinion.  "There simply is no such duty to collect further evidence absent inconsistency, conflict,

9  or a lack of evidence in the medical record such that additional or supplement medical evidence is

10  necessary to make a decision on the claim."  *Jewell v. Astrue*, No. 1:09-CV-0348-SKO, 2010 WL

11  3238849, at *6 (E.D. Cal. Aug. 12, 2010); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir.

12  2005).

13         In sum, the ALJ did not err in discounting Dr. Welden's assessment as "brief and

14  conclusionary in form with little in the way of clinical findings to support the conclusion that

15  appellant was totally disabled."  *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1988).

16         **2.      The ALJ's Consideration of Plaintiff's Bilateral Carpal Tunnel Syndrome**

17         Plaintiff contends the ALJ erred by failing to include in her residual functional capacity

18  ("RFC") assessment those limitations Dr. Bader had opined were imposed by Plaintiff's carpal

19  tunnel syndrome.  (Doc. 14, p. 16.)  The Commissioner contends the ALJ properly rejected Dr.

20  Bader's opinion regarding Plaintiff's manipulative limitations as inconsistent with completely

21  normal results from examination of Plaintiff's hands.  (Doc. 18, p. 12.)

22         The ALJ found that

23         . . . Dr. Bader noted that [Plaintiff]'s shoulder retained full range of motion
           without pain, his elbows were unremarkable, his wrists had full range of motion
24         without pain but did have bilateral Tinel's signs in his wrists, and that his hands
           retained the ability to engage in fine and gross manipulations. . . . Neurological
25         testing was equally unremarkable but with some decreased sensation in
           [Plaintiff's] bilateral median nerve distribution in his wrists.  Dr. Bader concluded
26         that [Plaintiff] had discogenic low back pain but also stated that [Plaintiff] had
           bilateral carpal tunnel syndrome . . . [and] was limited to non-strenous and non-
27         repetitive activities due to bilateral carpal tunnel syndrome.

28

18

(AR 32.)   As the ALJ discussed, "there was almost no evidence to support [Dr. Bader's] conclusion that [Plaintiff] had carpal tunnel syndrome and that it caused functional impairments." (AR 32.)  Nowhere else in the record was bilateral carpal tunnel syndrome mentioned, diagnosed, or observed.   (*See generally* AR.)   Dr. Bader's own diagnostic notes also do not support a conclusion of bilateral carpal tunnel syndrome.   (AR 32-33; *see* AR 425 (normal findings in Plaintiff's shoulders, elbows, and hands).)  Though Dr. Bader observed Tinel's signs in Plaintiff's wrists, he otherwise noted painless, full range of motion, "well preserved" fine and gross manipulation, and unimpaired ability to make a fist.  (AR 425.)  Notably, though Dr. Bader noted Plaintiff had bilateral carpal tunnel syndrome in his "discussion" and "functional assessment," he *only* proffered a single diagnosis of discogenic low back pain.  (AR 427.)

The ALJ further noted that during the hearing Plaintiff had testified that while he had problems with his hands, he has not spoken with a doctor about it.  (AR 33; *see* AR 57.)  No other credited medical source opined to a diagnosis of bilateral carpal tunnel syndrome or to any manipulative limitations imposed by bilateral carpal tunnel syndrome.  (*See generally* AR.)  The record as a whole is bereft of evidence demonstrating a medically determinable impairment of bilateral carpal tunnel syndrome exists.

The RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.   SSR 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Plaintiff contention that Dr. Bader's "uncontroverted clinical findings" and Dr. Welden's properly discredited opinion support a diagnosis of bilateral carpal tunnel syndrome is without merit.  (Doc. 14, p. 15.)  The record as a whole does not demonstrate the existence of a medically determinable impairment of bilateral carpal tunnel syndrome.   The single mention of this

1    syndrome in Dr. Bader's notes -- not even proffered as a formal diagnosis -- is not sufficient to

2    sustain a finding of disability.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("[t]he mere

3    existence of an impairment is insufficient proof of a disability"); *see also* 20 C.F.R. § 416.908 ("A

4    physical or mental impairment must be established by medical evidence consisting of signs,

5    symptoms, and laboratory findings, not only by your statement of symptoms"); 42 U.S.C. §§

6    423(d)(3), 1382(a)(3)(D) (a "physical or mental impairment" is one that "results from anatomical,

7    physiological, or psychological abnormalities which are demonstrable by medically acceptable

8    clinical and laboratory diagnostic techniques").

9        In sum, because the record does not establish the existence of a medically determinable

10   impairment of bilateral carpal tunnel syndrome, the ALJ did not err by failing to include any

11   limitations to her RFC assessment specifically addressing Plaintiff's alleged bilateral carpal tunnel

12   syndrome.  *See* SSR 96-7p.

13   **B.**     **The ALJ's Step 5 Analysis**

14       Plaintiff contends the ALJ erred at Step 5 by relying on VE testimony rather than applying

15   the Medical Vocational Guidelines (the "Grids"), by failing to explain the conflict between the

16   DOT requirements for the job Hand Packer and Plaintiff's ability to walk/stand, by failing to

17   include Plaintiff's illiteracy in her hypothetical to the VE, and by independently finding Plaintiff

18   was capable of performing the requirements of other medium-level jobs in the national economy.

19   (Doc. 14, pp. 6-11.)  The Commissioner asserts the ALJ properly relied on VE testimony rather

20   than applying the Grids.  (Doc. 18, p. 14.)  The Commissioner further asserts that because the VE

21   was aware of Plaintiff's inability to communicate in English, the failure to include an explicit

22   limitation in the hypotheticals posed to the VE was harmless.  (Doc. 18, pp. 19-20.)  Plaintiff

23   responds that the ALJ's RFC assessment that Plaintiff was capable of medium work with postural

24   limitations essentially "limited [Plaintiff] to performance of light-level jobs," and directs a finding

25   of disabled at Step 5.  (Doc. 19, p. 2.)

26   //

27   //

28   //

1          **1.      The ALJ Did Not Err By Relying on VE Testimony Rather than Applying the Grids**

Plaintiff contends that had the ALJ properly found Plaintiff illiterate *and* applied the appropriate age category ("individual of advanced age" or "closely approaching retirement age")[6], the Grids would dictate a finding of disabled.  20 C.F.R. § 404, subpt. P, app. 2, 202.00(c) (directing a finding of disabled for individuals of advanced age who are limited to light work or less unless they have sills that are "readily transferrable" to skilled or semi-skilled work); *id.* at § 202.00(f) (directing a finding of disabled for individuals closely approaching retirement age unless other work is so similar to their previous work they will need to "make very little, if any, vocational adjustment).  *See also id.* at § 202.02 (directing a finding of disabled for individuals of advanced age who can perform only light work and have limited or less education with a history of skilled or unskilled history with no transferable skills).

However, the Grids are only applicable where non-exertional limitations do not erode the representative occupational base.  *Lounsburry*, 468 F.3d at 1115 ("the [G]rids are predicated on a claimant suffering from an impairment which manifests itself by limitations in meeting the strength requirements of jobs ('exertional limitations'); they may not be fully applicable where the nature of a claimant's impairment does not result in such limitations ('non-exertional limitations')").  The reason for this limitation on the Grids' application is that, despite having the residual functional capacity to perform a full range of unskilled occupations at a given exertional level, a claimant may not be able to adjust to these jobs because of non-exertional limitations.  SSR 83-10 (January 1983).  In particular, non-exertional impairments -- including postural and manipulative limitations such as difficulty reaching, handling, stooping, climbing, crawling, or crouching -- may, if sufficiently severe, limit a claimant's functional capacity in ways not contemplated by the Grids.  20 C.F.R. § 404.1569.

Where such limitations exist, such as the postural limitations the ALJ included in her RFC assessment, VE testimony is *required* to determine the extent to which the medium work base is eroded.  *Swenson v. Sullivan*, 876 F.2d 683, 688 (9th Cir. 1989) (the Grids "are an administrative

---

[6]  Plaintiff was of advanced age on his alleged onset date and was closely approaching retirement age on the date of the ALJ's decision.  (AR 35-37.)

tool on which the Secretary must rely when considering claimants with substantially uniform levels of impairment," and, "[w]hen a claimant's nonexertional limitations significantly limit the range of performable work, the Secretary may not rely only on the [G]rids but must take the testimony of a vocational expert").

The Grids present, in table form, a short-hand method for determining the availability and numbers of suitable jobs for a claimant. *Tackett*, 180 F.3d at 1101. The Grids categorize jobs by their physical-exertional requirements and consist of three separate tables-one for each category: "[m]aximum sustained work capacity limited to sedentary work," "[m]aximum sustained work capacity limited to light work," and "[m]aximum sustained work capacity limited to medium work."[7] 20 C.F.R. § 404, subpt. P, app. 2, Rule 200.00. Each Grid presents various combinations of factors relevant to a claimant's ability to find work. The factors in the Grids are the claimant's age, education, and work experience. For each combination of these factors, *e.g.*, fifty years old, limited education, and unskilled work experience, the Grids direct a finding of either "disabled" or "not disabled" based on the number of jobs in the national economy in that category of physical-exertional requirements. *See id.* This approach allows the Commissioner to streamline the administrative process and encourages uniform treatment of claims. *See Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983) (discussing the creation and purpose of the Medical-Vocational Guidelines).

"The Commissioner's need for efficiency justifies use of the grids at step five where they *completely and accurately* represent a claimant's limitations. In other words, a claimant must be able to perform the full range of jobs in a given category, *i.e.*, sedentary work, light work, or medium work." *Tackett*, 180 F.3d at 1101 (italics in original) (citing *Heckler*, 461 U.S. at 461). While non-exertional limitations do not automatically preclude application of the Grids, *Descrosiers v. Sec'y of Health & Human Servs*., 846 F.2d 573, 577 (9th Cir. 1988), non-exertional limitations that "limit the claimant's functional capacity in ways not contemplated by the [Grids]" require the use of a VE to testify to the availability of jobs for the claimant, *Tackett*, 180 F.3d at

---

[7]   If a claimant is found able to work the full range of heavy work this is "generally sufficient for a finding of not disabled." 20 C.F.R. § 404, subpt. P, app. 2, § 204.00.

1  1101-02.

2      Here, there is no dispute that the ALJ imposed non-exertional functional limitations upon

3  Plaintiff's ability to perform the requirements of the full range of medium work.[8]  (AR 28-29.)

4  Because Plaintiff's non-exertional limitations "'significantly limit the range of work' he can

5  perform, mechanical application of the [G]rids was inappropriate." *Id.* (quoting *Desrosiers*, 846

6  F.2d at 577).  The ALJ did not err by relying on VE testimony rather than applying the Grids.

7      Plaintiff's contention that the erosion of the medium work base due to these non-exertional

8  limitations somehow means that he is consigned to light work is also without merit.  (*See* Doc. 19,

9  p. 2.)   Though the VE testified that the imposition of non-exertional limitations significantly

10 eroded the available medium work base (*see* AR 61 (a limitation to only occasional postural

11 activities would "rule out the great majority of medium jobs")), there are still medium occupations

12 existing in significant numbers in the national economy that Plaintiff is capable of performing (*see*

13 AR 60-61 (Plaintiff is able to perform the requirements of hand packer, DOT 920.587-018, 22,000

14 jobs in California and 200,000 in the nation; electronics worker, DOT 726.687-010, 11,000 jobs in

15 California and 80,000 in the nation; laundry worker, DOT 361.587-010, 5,000 jobs in California

16 and 40,000 in the nation)).  Plaintiff is not, therefore, somehow limited to light work by the non-

17 exertional limitations imposed by his medically determinable impairment.

18      **2.      The ALJ Did Not Err By Including a Limitation to Standing/Walking for Six**
19              **Hours in an Eight-Hour Workday in the Hypothetical to the VE**

20     Plaintiff contends the ALJ erred by including a limitation to "walk and stand for six hours

21 in an eight-hour workday," when Dr. Bader had opined Plaintiff could "walk and stand *no more*

22 *than* six hours out of an eight-hour day."   (Doc. 14, p. 10 (citing AR 29; 427).)    The

23 Commissioner asserts that the ALJ properly found Plaintiff could walk and stand for six hours in

---

[8]  The ALJ found Plaintiff retained the residual functional capacity ("RFC")

   . . . to lift/carry and push/pull up to fifty pounds occasionally and up to twenty-five pounds
   frequently, can stand/walk for six hours in an eight-hour workday, and has no limits on his ability
   to sit during the workday.  Further, [Plaintiff] can never climb ladders, ropes, or scaffolds; can
   occasionally climb ramps and stairs; and can occasionally balance, stoop, kneel, crouch, and
   crawl.

(AR 28-29.)

1  an eight-hour workday and explicitly communicated this to the VE. (Doc. 18, p. 20 (citing AR 60-

2  61).)

3       During the hearing, the ALJ asked the VE to consider an individual capable of, among

4  other limitations, standing and walking for six hours in an eight-hour day. (AR 60.) The VE

5  testified such an individual can perform the requirements of hand packer, DOT 920.587-018,

6  electronics worker, DOT 726.687-010, and laundry worker, DOT 361.587-010. (AR 60.)

7  Plaintiff's attorney then asked the VE whether a person limited to walk and stand "no more than"

8  six hours in an eight-hour day would be able to work. (AR 64-65.) The VE testified that all the

9  positions identified would be eliminated. (AR 65.)

10      Plaintiff contends that the ALJ's failure to "mention this part of the VE's testimony in her

11  decision" demonstrates that the ALJ's "conclusions are not based on vocational expert testimony."

12  (Doc. 14, p. 10.) However, there is no limitation to walk/stand "no more than" six hours out of an

13  eight-hour day into the ALJ's RFC assessment (*see* AR 29-30 (finding Plaintiff "can stand/walk

14  for six hours in an eight-hour workday")) and Plaintiff does not argue that the ALJ's RFC

15  assessment that he "can stand/walk for six hours in an eight-hour workday" was incorrect[9] (*see*

16  Docs. 14; 19). Limitations not included in the RFC do not have to be presented to the VE for

17  consideration. *See Valentine,* 574 F.3d at 690 ("[t]he hypothetical an ALJ poses to a vocational

18  expert, which derives from the RFC, must set out all the limitations and restrictions of the

19  particular claimant.") (internal citation and quotations omitted). The ALJ did not err by presenting

20  a hypothetical question to the VE comprising only those specific limitations encompassed in her

21  RFC assessment.

22       **3.      The ALJ Erred By Failing to Include Plaintiff's Illiteracy in Her Hypothetical
          to the VE**

23

24      Plaintiff contends that his illiteracy and inability to communicate in English are

25  inconsistent with the VE's testimony that he can perform the requirements of the hand packer job

26  [9]  Plaintiff appears to be arguing, in effect, that the ALJ failed to fully credit Dr. Bader's opinion that Plaintiff was

27  limited to walking and standing "no more than" six hours out of an eight-hour day. However, the ALJ partially
    discredited Dr. Bader's opinion and it therefore is not entitled to controlling weight, and, regardless, the ALJ was not
    required to incorporate into his assessed RFC every limitation opined to by Dr. Bader, *see* See 20 C.F.R. §

28  404.1545(a)(1) (ALJs are not required to base their RFCs on any one medical opinion; rather they consider the
    evidence in the record as a whole in formulating the RFC).

as defined in the DOT.  (Docs. 14, p. 9; 19, p. 3.)  Plaintiff argues the VE failed to explain how an individual who cannot read, write or speak English can perform the jobs identified.  (*Id.*)  The Commissioner contends that because the VE was present at the hearing and listened to Plaintiff testify in Spanish with the use of a translator, he necessarily knew that Plaintiff was illiterate and could not communicate in English and therefore must have taken it into account in his expert testimony.  (Doc. 18, pp. 19-21.)

The Commissioner bears the burden at Step 5 of proving that Plaintiff can perform other work in the national economy, given his RFC, age, education and work experience.  20 C.F.R. § 416.912(g); *Silveira v. Apfel*, 204 F.3d 1257, 1261 n.14 (9th Cir. 2000).  When considering education as a vocational factor, the categories of education that are considered include literacy and the ability to communicate in English.[10]  20 C.F.R. §§ 404.1564(b)(1), (b)(5); 416.964(b)(1), (b)(5).  Though literacy or education level is a vocational factor relevant only to the Step Five inquiry and not to the existence of a disability, *Silveira*, 204 F.3d at 1261 n.14, the ALJ must "definitively explain" the impact of a claimant's illiteracy on her ability to find and perform either past relevant work or alternative work, *Pinto v. Massanari*, 249 F.3d 840, 848 (9th Cir. 2001).

The VE identified at least one job that requires a Language Level 1.  (AR 60-61 (testifying Plaintiff could perform the requirements of hand packer, DOT920.587-018.)  Language Level 1 requires that a person have the following skills:

> Reading: Recognize meaning of 2,500 (two-or three-syllable) words. Read at a rate of 95-120 words per minute. Compare similarities and differences between words and series of numbers.
>
> Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.
>
> Speaking: Speak simple sentences, using normal word order, and present and past tenses.

*See* DICOT 920.587-018.

//

---

[10]   A distinction exists between an assessment of literacy and an assessment of the ability to communicate in English, and an ALJ must consider both in determining whether a claimant can perform work pursuant to the regulations.  20 C.F.R. §§ 404.1564(b)(1), (b)(5); 416.964(b)(1), (b)(5); *see also Calderon v. Astrue*, No. 1:08-CV-01015 GSA, 2009 WL 3790008, at *9 (E.D. Cal. Nov. 10, 2009).

Language Level 1 is the lowest language development contemplated by the DOT.  *Castillo v. Comm'r of Soc. Sec.*, No. 1:14-CV-01566-SAB, 2016 WL 54387, at *4 (E.D. Cal. Jan. 5, 2016); *see also Donahue v. Barnhardt*, 279 F.3d 441, 445 (7th Cir. 2002) ("basic literacy [defined as a vocabulary of 2,500 words, the ability to read about 100 words a minute, and the ability to print simple sentences] is essential for every job in the economy") (emphasis in original). "Understanding English is key to understanding and following workplace instructions, communicating with other workers, and responding to supervision."  *Kong v. Astrue*, No. 1:09-CV-01410-SMS, 2011 WL 674048, at *12 (E.D. Cal. Feb. 16, 2011).  "Because the DOT's level 1 language definition requires language ability more advanced than a non-English speaker can meet, if an ALJ determines that a non-English-speaking claimant can perform such a job, he or she must explain why the level 1 language requirement does not apply in that instance."  *Id.* (citing *Pinto*, 249 F.3d at 847).  If the ALJ omits that analysis, a court cannot review his or her decision.  *Id.*

Here, it is undisputed that during the hearing on April 24, 2103, the ALJ did not ask the VE to consider an illiterate individual unable to communicate in English.  (*See* AR 58-66.)  It is also undisputed that despite acknowledging in the written decision that Plaintiff "is not able to communicate in English, and is considered the same way as an individual who is illiterate in English," the ALJ then did not explain the inconsistency between Plaintiff's literacy and his ability to perform the requirements of Language Level 1.  (*See* AR 35-36.)  This is reversible error.  *See Pinto*, 249 F.3d 840; *Yacoub v. Colvin*, No. 1:14-CV-00884-SKO, 2016 WL 541407, at *14 (E.D. Cal. Feb. 11, 2016); *Her v. Astrue*, No. 1:09-CV-0945 SKO, 2010 WL 3238841 (E.D. Cal. Aug. 12, 2010).

Even when the ALJ *has* included the claimant's language limitations in his hypothetical questions to the VE, the Ninth Circuit has held it is still reversible error where the ALJ failed to explain his decision to deviate from the DOT's language requirements.  *Pinto*, 249 F.3d at 846-47.  In *Pinto*, the Ninth Circuit faulted the ALJ's failure to explain how the claimant's "language and literary abilities" figured in his determination that the claimant could return to her work hand-packing pig feet, chitterlings, pig skin, and chilies.  *Id.* at 846.  *See also Her*, 2010 WL 3238841 (explaining that, although an ALJ naturally relies on a VE's testimony, the record must include

persuasive evidence to support the opinion and the VE must testify regarding the deviation from the DOT language requirement).  Literacy and ability to communicate in English are vocational factors that have been strictly applied in this Circuit.

The Commissioner's citation to *Meza v. Astrue*, No. C-09-1402-EDL, 2011 WL 11499, at *20-21 (N.D. Cal. Jan. 4, 2011), to support a finding that no DOT conflict exists is inapposite. (Doc. 18, p. 20.)  The Commissioner contends *Meza* found no error where the VE had testified that a Spanish-speaking and illiterate individual could perform representative jobs requiring reasoning level 2 and language level 1.  (Doc. 18, p. 20.)  However, in *Meza*, the VE specifically addressed the claimant's literacy and ability to communicate in English by testifying that the claimant could perform jobs where someone else could give a short demonstration and the claimant could then carry out the job.  2011 WL 11499, at *21.  No such testimony was elicited here.

The Commissioner also contends that because Plaintiff's previous work "required *greater* language ability than the hand packager job," Plaintiff has demonstrated he can perform the requirements of language level 1.  (Doc. 18, p. 20-21.)  The Ninth Circuit, however, has already resoundingly rejected the argument that a claimant's previously performance of work requiring a higher language level somehow excused the ALJ from explaining how the claimant's language limitations would impact her ability to find and perform a similar job or the requirements of the jobs identified by the VE.  *Pinto*, 249 F.3d at 847.  Even were the Ninth Circuit unclear on this issue, the ALJ did not offer any explanation for her deviation from the DOT and this Court may review "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  *Orn*, 495 F.3d at 630.

In sum, the VE's testimony that Plaintiff can perform work as a hand packer conflicts with the DOT Language Level requirements for that job, and the ALJ's finding that Plaintiff can perform the requirements of this representative occupation is not supported by substantial evidence.  Remand is appropriate on this issue.

//

//

27

1

### 4. The ALJ's Independent Findings of Alternative Medium Jobs that Plaintiff Retained the RFC to Perform Was Harmless Error

2

3

Finally, Plaintiff contends the ALJ committed reversible error by "independently finding

4

there were other medium-level jobs Plaintiff could perform and failing to provide an adequate

5

explanation for this finding." (Doc. 14, p. 10.)  The Commissioner responds that even were this

6

error, any error was harmless because "the ALJ did not rely on this finding to find Plaintiff not

7

disabled; the identification of the hand packer position sufficiently established Plaintiff could

8

work under the agency's rules[.]" (Doc. 18, p. 21.)  Though the Court agrees that the ALJ erred

9

by finding, *sua sponte* and without eliciting expert testimony as required by law, that Plaintiff was

10

capable of other work in the national economy, this error was ultimately harmless.  The ALJ's

11

determination Plaintiff was not disabled was based on her conclusion Plaintiff could perform the

12

requirements of work as a hand packer, not on her improper independent finding that there were

13

other medium-level jobs in the DOT which she believed Plaintiff would be capable of

14

performing.[11]  *See Carmickle*, 533 F.3d at 1162 (an error is harmless where there "remains

15

substantial evidence supporting the ALJ's conclusions on . . . credibility and the error does not

16

negate the validity of the ALJ's ultimate [credibility] conclusion") (internal citation and quotations

17

omitted) (alteration in original).

### C. Remand for One Issue

18

This case shall be remanded for the ALJ to consider whether Plaintiff's illiteracy and

19

inability to communicate in English seriously impacts Plaintiff's ability to work.

20

In all other respects, the ALJ's findings are affirmed.

21

### CONCLUSION

22

Based on the foregoing, the Court finds that remand is necessary to reconsider the impact

23

of Plaintiff's illiteracy and inability to communicate in English on his ability to work.

24

Accordingly, the Court GRANTS Plaintiff's appeal from the administrative decision of the

25

26

27

28

---

[11] The Court notes that remand remains necessary because, while the ALJ's decision to independently find other jobs she believed Plaintiff to be capable of performing was *harmless* error, the ultimate disability determination was based upon the ALJ's improper reliance on VE testimony that conflicted with the DOT.  The ALJ's reliance on Plaintiff's ability to perform the requirements of the hand packer job despite that he is illiterate and unable to communicate in English, without explanation for the deviation, remains *harmful* error and warrants remand.

Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Francisco Fierro Obeso, and against Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **April 19, 2016**                                  **/s/ Sheila K. Oberto**
                                                     UNITED STATES MAGISTRATE JUDGE